## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| HECKMANN BUILDING PRODUCTS INC. AND MASONRY TIE SYSTEM, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 10 C 4262 |
| HOHMANN & BARNARD, INC., BLOK-LOK LIMITED, LIGHTHOUSE MASONRY, INC. AND DRISCOLL SALES & DISTRIBUTING, LLC, | ) ) ) ) ) | Magistrate Judge Morton Denlow |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case is now before the Court on a motion for contempt brought by Plaintiff Heckmann Building Products, Inc. ("Plaintiff" or "Heckmann") against Defendant Hohmann & Barnard, Inc. ("Defendant" or "Hohmann"). Plaintiff seeks to hold Defendant in contempt for failure to comply with the Consent Decree entered by Judge William T. Hart on March 10, 2011 ("Consent Decree"). Under the terms of the Consent Decree, Defendant agreed not to manufacture, market, use, sell or distribute the wing nut masonry anchor ("Hohmann #1") which was the subject matter of this patent infringement lawsuit. Plaintiff contends that the newly designed anchor that Defendant began selling in the spring of 2011 ("Hohmann #2") violated the Consent Decree.

The Court held a two-day bench trial on April 26-27, 2012. The Court has carefully

considered the testimony of the five witnesses who testified in person, the two witnesses who testified by means of video depositions, the parties' trial exhibits, the parties' proposed findings of fact and conclusions of law, and the closing arguments of counsel. The following constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent certain findings of fact may be deemed conclusions of law, they shall also be considered conclusions. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings.

## FINDINGS OF FACT

### A.    THE PARTIES AND THE WITNESSES.

1.    Plaintiff Heckmann manufactures masonry anchors and ties for the construction industry. T. 50-52.[1] The anchors and ties connect the backup wall to the outside brick wall, passing through the insulation to hold the brick in place. T. 51. Terry M. Curtis is Heckmann's Chief Executive Officer. T. 50. He testified at the trial. Terry's brother, Paul Curtis, is Heckmann's President and Chief Operating Officer. T. 89. He testified at the trial. The business was founded by Terry and Paul's grandfather and has been operated continuously as a family business since 1923. T. 52.

2.    Plaintiff Masonry Tie Systems, Inc. ("MTS") was the owner of United States

---

[1]T. ___ refers to trial transcript page; Dkt. ___ refers to the court docket number in this case; PX ___ refers to Plaintiff's trial exhibits; DX ___ refers to Defendant's trial exhibits; Bronner dep.___ refers to the Joseph Bronner deposition at PX 47 and DX 37; Burkhardt dep. ___ refers to the Ronald Burkhardt deposition at PX 46.

Patent No. 7,415,803 ("the '803 patent" or "Pos-I-Tie" patent") at the time the complaint was filed and at the time the motion for contempt was filed. Heckmann began selling the Pos-I-Tie in 2006, even before the patent was issued. T. 108. On December 31, 2008, MTS entered into an exclusive license with Heckmann to manufacture and market the '803 wing nut anchor. PX 35, T. 54-55. MTS terminated the exclusive license effective February 26, 2012. Dkt. 43. MTS is owned by Joseph Bronner, the inventor of the '803 patent. T. 54, PX1. Plaintiff MTS originally joined in this motion for contempt, but later withdrew its participation after it terminated its exclusive license with Plaintiff Heckmann and entered into an agreement with Defendant Hohmann by which MTS sold the '803 patent to Hohmann. Dkt. 43, 52. Joseph Bronner testified by means of a video deposition. PX 47, DX 37.

3.     Defendant Hohmann has been a long time competitor of Plaintiff Heckmann. T. 62-63. Hohmann manufactures different components for masonry and stone exterior support systems. T. 169. Ronald E. Hohmann, Jr. is Hohmann's President. He testified at the trial. Ronald Burkhardt is Hohmann's Executive Vice-President and Chief Financial Officer. He testified by means of a video deposition. Joseph C. Carr, Jr. is Hohmann's Vice-President, Secretary and General Counsel. T. 212. He testified at the trial. Hohmann was a family owned business until it was acquired by Mitek USA, Inc. in 2008. T. 242.

## B.	THE FILING AND SETTLEMENT OF THE LAWSUIT.

4.	Plaintiffs filed this lawsuit on July 9, 2010 alleging that Hohmann was infringing on the '803 patent when it began selling the Hohmann #1 wing nut anchor which was called the Wing Nut 2 - Seal Tie.  Dkt. 1, PX 13, DX 35.

5.	Plaintiff's Pos-I-Tie was the first wing nut masonry anchor.  T. 61.  The masonry anchors help to keep brick walls in place.  T. 91.

6.	After service of process was made, the parties negotiated an early settlement of the case.  PX 3.  The business portion of the settlement negotiations were conducted between Terry Curtis on behalf of Plaintiffs and Ronald Burkhardt on behalf of Hohmann.  T. 66, Burkhardt Dep. 23-27.  At the time, Plaintiff and Hohmann were the only two companies selling wing nut type masonry anchors.  T. 103-04.  On November 1, 2010, Burkhardt emailed Terry Curtis and offered to settle the lawsuit by, among other things, accepting "a court injunction to cease manufacturing, marketing and selling the accused product."  PX 39.  In addition, Burkhardt offered to pay a royalty on past sales, offered to sell its Hohmann #1 inventory to Plaintiffs or sell it as scrap, and also advised Plaintiffs that it was "in the process of developing alternative products to the Pos-I-Tie which will not infringe on the Pos-I-Tie patent."  *Id*.  After receiving this email, Terry Curtis does not recall any further discussion with Burkhardt about Hohmann's alternative products.  T. 73.  Plaintiffs did not ask for a sample of the redesign prior to the settlement of the lawsuit.  T. 154.

7.	On November 2, 2010, Terry Curtis, acting on behalf of Plaintiffs, emailed

Burkhardt and accepted Hohmann's offer to settle the lawsuit. DX 7. Plaintiff understood that as part of the settlement, Hohmann would agree to cease manufacturing, marketing and selling the accused product, the Hohmann #1. T. 153.

8.    After Plaintiffs accepted Hohmann's settlement offer, counsel for the parties began the process of drafting and negotiating the settlement documents. T. 72, 215-23, 244-45.

9.    On November 18, 2010, Nicholas Schmidbauer, Plaintiffs' counsel, emailed a draft set of settlement documents, including a draft Consent Decree and Settlement Agreement to Joseph C. Carr, Jr., Hohmann's counsel. DX 8. Schmidbauer did not testify at the trial. After receiving the drafts, Carr called Schmidbauer to express concerns regarding three major issues: (a) the definition of the term "accused wing nut," (b) the absence of a no admission of liability provision, and (c) a definition of net sales rather than gross sales in determining the royalty. T. 218-20, 244-47. Carr told Schmidbauer that the definition of the accused product would have to be very specific and cover only the specific anchor (Hohmann #1) that Hohmann was then manufacturing. T. 218-20.

10.    Paragraph 3 of the draft Consent Decree prepared by Mr. Schmidbauer stated:

> Hohmann, their successors and assigns, and their officers, agents, servants, representatives, and employees, and all persons in active concert or participation with them who receive actual notice of this Consent Decree by personal service or otherwise, are hereby enjoined, directly or through any corporation, subsidiary, division, website, or other device, from manufacturing, using, selling or distributing **any wing nut identified in the Amended Complaint** in the United States, or from importing or exporting any wing nut identified in the Amended Complaint into or outside of the United States. (Emphasis added).

DX 8 (MLP 12).

11.     The amended complaint filed by Heckmann and MTS identified the following wing nut products:  (1) "Wing Nut 2-Seal Tie™"; (2) "2-Seal Wing Nut Anchor Body;" and (3) "any other infringing wing nuts."  Dkt. 7.  This language was too broad for Carr and he so advised Schmidbauer.  T. 218-220.

12.     On November 30, 2010, Carr revised and returned an edited version of the settlement documents to Schmidbauer for his review.  DX 9.  Carr revised the Settlement Agreement and Consent Decree to limit the scope of the injunction to the accused wing nut specifically referenced in the amended complaint.  DX 9, T. 221-28, 260-61.  Of relevance here, the revised Consent Decree sent by Carr provided:

> 3.  Hohmann, their successors and assigns, and their officers, agents, servants, representatives, and employees, and all persons in active concert or participation with them who receive actual notice of this Consent Decree by personal service or otherwise, are hereby enjoined, directly or through any corporation, subsidiary, division, website, or other device, from manufacturing, marketing, using, selling or distributing any masonry anchor of the type heretofore marketed by Hohmann, as depicted in Figures 1-3 of attached and incorporated **Exhibit A** hereto, which anchor includes, in pertinent part, a wing nut **1** having a central hollow barrel **2** mounted on the shaft **3** of a bolt, the nut **1** having two generally planar side wings **4**, **5** extending laterally from the central barrel and being rotatable independently of the shaft **3** in both clockwise and counterclockwise directions about the shaft, or from importing or exporting any such masonry anchor into or outside of the United States.

DX 9 (MLP 137).

13.     The revised Settlement Agreement also provided a new definition of "Accused Double - Wing Nut Anchor:"

> 1.02.1 "Accused Double-Wing Nut Anchor" means a masonry anchor of the type heretofore marketed by Hohmann, as depicted in Figures 1-3 of attached and incorporated **Exhibit A** hereto, which anchor includes in pertinent part, a wing nut **1** having a central hollow barrel **2** mounted on the shaft **3** of a bolt, the nut 1 having to generally planar side wings **4, 5** extending laterally from the central barrel and being rotatable independently of the shaft **3** in both clockwise and counterclockwise directions about the shaft.

DX 9 (MLP 131-32).

14.    Schmidbauer agreed to the language proposed by Carr, and after making some additional nonsubstantive edits, the parties finalized the Settlement Agreement and Consent Decree. DX 10-13. There was never any discussion between the attorneys to bar Hohmann from redesigning and manufacturing a different wing nut anchor. T. 226-27.

15.    The parties executed the Settlement Agreement on December 2, 2010. PX 3, DX 3-5. The Consent Decree was later entered by Judge Hart on March 10, 2011. PX 4, Dkt. 18.

16.    The Consent Decree provides that "[t]he Parties have agreed to settlement of this action upon the following terms and conditions, without any adjudication of any issue of fact or law." PX 4.

17.    Paragraph 3 of the Consent Decree entered by the Court includes the language proposed by Carr:

> Hohmann, their successors and assigns, and their officers, agents, servants, representatives, and employees, and all persons in active concert or participation with them who receive actual notice of this Consent Decree by personal service or otherwise, are hereby enjoined, directly or through any corporation, subsidiary, division, website, or other device, from

manufacturing, marketing, using, selling or distributing any masonry anchor of the type heretofore marketed by Hohmann, as depicted in Figures 1-3 of attached and incorporated **Exhibit A** hereto, which anchor includes, in pertinent part, a wing nut **1** having a central hollow barrel **2** mounted on the shaft **3** of a bolt, the nut **1** having two generally planar side wings **4, 5** extending laterally from the central barrel and being rotatable independently of the shaft **3** in both clockwise and counterclockwise directions about the shaft, or from importing or exporting any such masonry anchor into or outside of the United States.

PX 4.

18. Hohmann manufactures a great number of anchors and Carr wanted to be specific through words and pictures that Hohmann was committing not to manufacture only the Hohmann #1. T. 232-237. The Court finds Carr's explanation of the negotiations totally credible and consistent with the documents that reflect the drafting process that took place.

19. Figures 1-3 of the attached and incorporated Exhibit A to the Consent Decree are reproduced below and depict the Hohmann #1, *i.e.* the particular device enjoined by the Consent Decree:

**EXHIBIT A**

**Accused Double Wing Nut Anchor**



PX 4. The drawings depict the Hohmann #1, not the Hohmann #2. T. 155-56. The language above the drawings makes it clear that the drawings relate only to the Hohmann #1, the accused double wing nut anchor. T. 262. The drawings were made by a draftsman from an actual model of the Hohmann #1. T. 255-57.

20.     The three figures in Exhibit A show that the wing nut of the accused device rotates freely in both the clockwise and counterclockwise directions. PX 4, 13, 19. At no time did the parties discuss or agree that Hohmann would not be free to develop a modified wing nut anchor.

## C.     THE DEVELOPMENT AND MANUFACTURE OF THE HOHMANN #2 WING NUT ANCHOR.

21.     After the Consent Decree was entered, Hohmann began marketing and selling a redesigned Wing Nut 2-Seal Tie ("Hohmann #2"). PX7, 14, DX 18. Hohmann does not manufacture the Hohmann #2. It is manufactured for it by another company. Ronald

Hohmann, Jr. designed the Hohmann #2. T. 194. The purpose of the redesign was to manufacture a one-way spin wing nut anchor. DX 20-23. It was designed to only turn counter-clockwise in normal use. T. 182-83. The redesign effort took place from August 2000 through Spring 2011. T. 177. The Hohmann #2 includes a spring and ratcheting feature not present in the Hohmann #1. This ratcheting feature was specifically designed to prevent the wing-nut of the Hohmann #2 from being rotated in a clockwise direction. T. 174-77, 183-86, 195-98. When used as intended, the ratcheting feature successfully prevents the wing-nut from rotating in a clockwise direction. The ratcheting feature of the Hohmann #2 also prevents the wing nut from rotating freely in either a clockwise or counterclockwise direction independently of the shaft of the bolt. *Id.*

22. Plaintiff became aware of the Hohmann #2 by means of an ad that appeared in Masonry Magazine in January, 2011. PX 7, T. 75-76. The picture did not reveal the spring or the ratchet teeth present in the Hohmann #2. PX 7. Terry Curtis contacted Burkhardt on January 12, 2011 to complain and to request a sample. DX 14, PX 7, 10, 37. T. 76-79. Burkhardt responded and agreed to change the ad, because it did not depict the mechanisms which were included to prevent rotation of the wing nut in both directions. DX 15. Ronald Hohmann, Jr. took prompt steps to change the pictures in the ad to better show the ratcheting mechanism. PX 45, DX 16.

23. The Hohmann #2 is not the masonry anchor depicted in Exhibit A to the Consent Decree.

24. As Joseph Bronner, the owner and inventor of the '803 patent, recognized, only

by manipulating the Hohmann #2 can a user overcome the force applied by the spring and ratcheting mechanism of the Hohmann #2 to turn it in both a clockwise and counterclockwise direction. Bronner Dep. 44-49, 55-56. Although Bronner tested the Hohmann #2, he had no opinion whether the Hohmann #2 violated the Consent Decree. Bronner Dep. 126-28.

**D.    THE HOHMANN #2 WING NUT ANCHOR DOES NOT VIOLATE THE CONSENT DECREE.**

25.    The Hohmann #2 is not a masonry anchor "of the type heretofore marketed by Hohmann" as contemplated by Paragraph 3 of the Consent Decree.

26.    Pursuant to the Court's December 15, 2011 minute entry, the Consent Decree expired on February 26, 2012. Dkt. 52.

27.    Hohmann did not manufacture, market, use, sell or distribute the Hohmann #1 between March 10, 2011 and February 26, 2012.

28.    Hohmann did not, between December 2, 2010 and February 26, 2012, manufacture, market, use, sell or distribute any "masonry anchor of the type heretofore marketed by Hohmann, as depicted in Figures 1-3 of attached and incorporated **Exhibit** A[,]which anchor includes, in pertinent part, a wing nut **1** having a central hollow barrel **2** mounted on the shaft **3** of a bolt, the nut **1** having two generally planar side wings **4, 5** extending laterally from the central barrel and being rotatable independently of the shaft **3** in both clockwise and counterclockwise directions about the shaft." Hohmann did not violate the Consent Decree by the manufacture, marketing and sale of the Hohmann #2.

29.    Hohmann's efforts in redesigning its product, and ceasing all sales and

marketing of the Hohmann #1, were a reasonable and diligent effort to comply with the Consent Decree. The Consent Decree did not bar Hohmann from selling a redesigned wing nut anchor.

## CONCLUSIONS OF LAW

**A.     JURISDICTION.**

30.     Plaintiff's original claim for patent infringement arose under the patent laws. 35 U.S.C. §§ 271, 281. The Consent Decree specifies that the Court retains jurisdiction for purpose of the enforcement of compliance therewith, or for addressing violations thereof. PX 4 ¶ 1. Pursuant to the Consent Decree, Heckmann has the right to seek enforcement of the injunction contained in the Consent Decree with respect to Hohmann's alleged violation arising out of the manufacture and sale of the Hohmann #2 wing nut. The parties have consented to this Court's jurisdiction pursuant to 28 U.S.C. §636(c). Dkt. 83. Therefore, this Court has jurisdiction to decide the motion for contempt.

**B.     LEGAL STANDARDS**.

31.     To prevail on a motion for contempt, the moving party must prove by clear and convincing evidence that the respondent has "violated the express and unequivocal command of a court order." *F.T.C. v. Trudeau*, 579 F.3d 754, 763 (7th Cir. 2009) (quoting *Autotech Techs. LP v. Integral Research & Dev. Corp*, 499 F.3d 737, 751 (7th Cir. 2007)).

32.     Heckmann carries the burden to show, by clear and convincing evidence, that: (1) the Consent Decree sets forth an unambiguous command; (2) Hohmann violated that command; (3) the violation was significant, meaning it did not substantially comply with the

Order; and (4) Hohmann failed to take steps to reasonably and diligently comply with the Order. *See id.* (quoting *Prima Tek II, L.L.C. v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533, 542 (7th Cir. 2008)).

33. Plaintiff places great emphasis on the standard articulated in *TiVo Inc. v. Echostar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011), and urges this Court to consider that standard in determining whether there has been a violation of the Consent Decree. The *TiVo* court held: "The criteria for adjudicating a violation of a prohibition against continued infringement by a party whose products have already been adjudged to be infringing is a matter of Federal Circuit law.... [T]he party seeking to enforce the injunction must prove both that the newly accused product is not more than colorably different from the product found to infringe and that the newly accused product actually infringes." *Id.*

34. In contrast to *Tivo*, where there is a finding of infringement, the Consent Decree in the case at bar was entered "without any adjudication of any issue of fact or law." *See id.*; *Aevoe Corp. v. AE Tech Co.*, No. 2:12-cv-00053-GMN-RJJ, 2012 U.S. Dist. LEXIS 61204, at *5-7 & n.1 (D. Nev. May 2, 2012) (hesitating to apply *TiVo* where only a preliminary injunction in a patent infringement case was issued); *Petter Invs., Inc. v. Hydro Eng'g, Inc.*, No. 07 CV 1033, 2011 U.S. Dist. LEXIS 77646 (W.D. Mich. July 18, 2011) (applying *TiVo* in a contempt motion where summary judgment of infringement was entered in favor of the counter-plaintiffs and the parties entered a stipulated permanent injunction).

35. The case at bar does not involve a case of adjudged patent infringement, an entry of a preliminary injunction, or a case of agreed patent infringement. Because the

Consent Decree expressly provides that it was entered "without any adjudication of any issue of fact or law," the "colorable difference" standard announced by the Federal Circuit in *Tivo* is inapplicable.

36.     While the settlement agreement contains an Illinois choice of law provision, the Consent Decree does not incorporate the settlement agreement.  PX 3 ¶ 6.07; PX 4.  The Court is asked to interpret the Consent Decree rather than the settlement agreement signed by the parties.  As the claim arose under federal law and the Consent Decree was entered in the United States District Court for the Northern District of Illinois, federal common law governs interpretation of the Consent Decree.  *See United States of America v. Volvo Powertrain Corp.*, No. 98-2547, 2012 U.S. Dist. LEXIS 51951, at *8 n.1 (D. D.C. Apr. 13, 2012) ("A federal court interpreting its own consent decree applies the federal common law of contracts.");  *In re Harvey*, 213 F.3d 318, 321-22 (7th Cir. 2000) (suggesting an analogy between the federal nature of bankruptcy and the use of federal law to construe federal court consent decrees).

37.     While consent orders have the force of a court order, they are a form of contract to be construed according to the basic principles of contract interpretation.  The United States Supreme Court explains:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms.  The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation.  Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation.  Thus, the decree itself cannot be said

to have a purpose; rather the parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it. Because the defendant has, by the decree, waived [its] right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.

*United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971); *see also Goluba v. Sch. Dist. of Ripon*, 45 F.3d 1035, 1038 (7th Cir. 1995) (citing *Armour* and holding that the explicit terms of consent decree control unless the terms are facially ambiguous).

## C. HECKMANN HAS NOT PROVEN BY CLEAR AND CONVINCING EVIDENCE THAT HOHMANN VIOLATED AN UNAMBIGUOUS COMMAND CONTAINED IN THE CONSENT DECREE.

### i. The Consent Decree Contains an Unambiguous Command.

38.     The language of the Consent Decree is not ambiguous: Hohmann was enjoined from manufacturing, marketing, using, selling or distributing the specific product that was the subject of the lawsuit and depicted in Exhibit A—the Hohmann #1.

39.     The Consent Decree includes a detailed description, element by element, of that product ("any masonry anchor of the type heretofore marketed by Hohmann, as depicted in Figures 1-3...which anchor includes..."). Reference to the anchor "heretofore marketed by Hohmann" and the list of specific elements which describe the Hohmann #1 makes it unambiguously clear that only the Hohmann #1 was enjoined. The injunction in the case at bar relates to a specific product: the list of relevant characteristics of that product makes the

language of the consent decree clear on its face. *See, e.g.*, *Panduit Corp. v. Hellermanntyton Corp.*, 451 F.3d 819, 823-27 (Fed. Cir. 2006) (interpreting a settlement agreement under Illinois law and finding that an agreement not to make or sell "Subject Products," which was defined with reference to a specific product, did not prohibit colorable changes, modifications or variations).

40.     There is no language in the Consent Decree that could be construed to prevent Hohmann from manufacturing, marketing, using, selling or distributing a wing nut that does not have the explicit features identified in the Consent Decree. *See, e.g.*, *McGee v. Ill. Dept. Of Trans.*, No. 02 C 0277, 2002 U.S. Dist. LEXIS 21463, at * 15-17 (N.D. Ill. Nov. 4, 2002) (finding no language in a consent decree that reflected a resolution of issues other than those in the original pleading).

41.     The Hohmann #2 wing nut is not the same as the Hohmann #1 wing nut.[2] The Hohmann #2 contains a ratchet and spring system that prevents the planar side wings from rotating independently, without manipulation, in the clockwise direction. This modification removes the Hohmann #2 from the clear language of the Consent Decree. Under the unambiguous language of the Consent Decree, this element is required in order for Heckmann to show a violation of the injunction. The Hohmann #2 is different from the Hohmann #1 and not prohibited under the Consent Decree.

---

[2]The Court notes that had Hohmann marketed a product that contained only changes other than the specific elements described (changing the color, for example) the new product would, in substance, have been equal to the original product and a potential violation of the Consent Decree. That is simply not the case here.

16

**ii.**   **Oral Testimony Confirms the Consent Decree Enjoined Hohmann from Manufacturing, Marketing, Using, Selling, or Distributing Only the Hohmann #1.**

42.     In order to ensure a full understanding of the products and to provide a complete record in the event of later review, the Court heard oral testimony and reviewed exhibits on how the products function and on the formation of the settlement agreement. The purpose was to determine whether the negotiations between the parties would confirm or reject the Court's understanding that the scope of "any masonry anchor of the type heretofore marketed by Hohmann," was limited to the Hohmann #1 wing nut.[3]

43.     The oral testimony and the related exhibits regarding the negotiation of the terms of the Consent Decree confirms that the injunction of Paragraph 3 is limited to the manufacturing, marketing, using, selling or distributing of the original anchor—the Hohmann #1.

44.     First, Hohmann offered to settle the lawsuit by, among other things, accepting "a court injunction to cease manufacturing, marketing, and selling *the accused product*." The accused product was the Hohmann #1. Heckmann accepted that offer on November 2, 2010.

45.     Second, counsel for Hohmann changed the language of paragraph 3 of the draft consent decree from covering any product that "infringes" the claims of the '803 patent to the specific device depicted in Figures 1-3 of the Consent Decree. That device was the

---

[3]Had the Court found the language of the Consent Decree to be ambiguous, the first requirement for a finding of contempt - that there be an unambiguous command - would not be satisfied.

Hohmann #1, and was the only wing nut masonry anchor "heretofore marketed by Hohmann." These changes were accepted by Heckmann, through its counsel, and were incorporated into the final version of the Consent Decree that was entered by the Court.

46. Third, Hohmann informed Heckmann that they were in the process of developing alternative products to the Pos-I-Tie that would not infringe on the patent.

47. As the Hohmann #2 is not the same product as the Hohmann #1, Hohmann did not manufacture, market, use, sell or distribute any enjoined product between the date the Consent Decree was executed by the parties [December 2, 2010] and the expiration date of the Consent Decree [February 26, 2012].

48. In sum, Heckmann has failed to establish by clear and convincing evidence that Hohmann violated the unambiguous command, specifically the injunction of Paragraph 3, of the Consent Decree.

## D. HOHMANN TOOK REASONABLE AND DILIGENT STEPS TO COMPLY WITH THE CONSENT DECREE.

49. Hohmann took reasonable and diligent steps to comply with the Consent Decree. The parties do not dispute that Hohmann did not manufacture, market, use, sell, or distribute the Hohmann # 1 for the period of time between the execution of the Consent Decree and the date the Consent Decree expired. Rather, Hohmann specifically redesigned the Hohmann #1 to prevent the planar side wings of the wing nut from turning independently of the shaft of the bolt in a clockwise direction.

50. Communication between Ron Hohmann Jr. and the manufacturer of the product

show that Hohmann took diligent steps to ensure the planar wings did not rotate independently of the shaft in the Hohmann #2. Upon inspection, Ron Hohmann Jr. deemed that a sample was unacceptable because the wing nut could spin in both directions. DX 21. He later approved an alternate steel material specifically recommend to rectify the problem. DX 22. *See, e.g.*, *Prima Tek II, L.L.C. v. Klerk's Plastic Industries*, 525 F.3d 533, 542 (7th Cir. 2008) (finding that a party took reasonable steps to comply with a court order where the management team reviewed the order with legal counsel, informed employees of new policies, and held quarterly meetings despite the fact that some of the defendant's employees were not aware of newly implemented policies.).

## E. GOOD CAUSE DOES NOT SUPPORT AN ENTRY OF JUDGMENT FOR REASONABLE COUNSEL FEES BUT DEFENDANTS ARE AWARDED COSTS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 54(d)(1).

51. Pursuant to Local Rule 37.1, Hohmann asks the Court to enter judgment against Heckmann for Hohmann's costs and disbursements and a reasonable counsel fee. Local Rule 37.1(d) provides that where a motion for contempt is denied, "[t]he court may in its discretion for good cause shown enter judgment against the complainant and for the alleged contemnor for the latter's costs and disbursements and a reasonable counsel fee." Local Rule 37.1(d).

52. The Court does not find good cause exists to exercise its discretion and enter a judgment for reasonable counsel fees against Heckmann. Heckmann has the right to seek enforcement of the Consent Decree where they have a legitimate belief that the agreement has been violated. As detailed above, Hohmann redesigned the Hohmann #1 and began

marketing a new wing nut product that was, in several respects, similar to the Hohmann #1. While ultimately not successful, Heckmann was justified in its filing. *See Nav-Aids Ltd. V. Nav-Aids USA, Inc.*, No. 01 C 0051, 2002 U.S. Dist. LEXIS 23024, at *16 n.10 (N.D. Ill. Nov. 26, 2002) (denying a motion for an order of contempt brought pursuant to Local Rule 37.1 and holding "we find that both parties were justified in their filings and thus an award of fees is not justified."). Thus, the Court declines to award a reasonable counsel fee against Heckmann and in favor of Hohmann.

53.     Federal Rule of Civil Procedure 54(d)(1) provides that unless a statute, the Federal Rules, or a court order provides otherwise, a prevailing party may recover costs. Fed. R. Civ. P. 54(d)(1). As Hohmann is the prevailing party in this motion for contempt and no authority provides otherwise, the Court awards Hohmann court costs incurred in defense of the motion.

<u>CONCLUSION</u>

**For the reasons set forth in this opinion, the Court denies Plaintiffs' Motion for Contempt. The Court awards costs and disbursements in favor of Defendant Hohmann & Barnard, Inc. pursuant to Federal Rule 54(d)(1) and against Plaintiff Heckmann Building Products, Inc. Defendant is to submit a bill of costs on or before June 22, 2012. Plaintiff is to file its objections, if any, on or before July 13, 2012. The Court will rule by mail on or before August 3, 2012.**

**SO ORDERED THIS 1ST DAY OF JUNE, 2012.**

*Morton Denlow*

_____

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

David C. McLauchlan
The McLauchlan Law Group LLC
401 North Michigan Avenue
Suite 1200
Chicago, Illinois 60611

Jeffrey A. Pine
Dykema Gossett PLLC
10 South Wacker Drive
Suite 2300
Chicago, Illinois 60606

Keith A. Rabenburg
Michael J. Hartley
Senniger Powers LLP
100 North Broadway
17th Floor
Saint Louis, Missouri 63102

John B. Conklin
John K. Winn
Leydig, Voit & Mayer, Ltd.
Two Prudential Plaza
Suite 4900
180 North Stetson Avenue
Chicago, Illinois 60601

**Counsel for Plaintiffs**

**Counsel for Defendants**